**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE:** ) | |
| **CANOPY FINANCIAL, INC.,** ) | |
| ) | |
| **Debtor.** ) | |
| ) | |
| -------------------------------------------------------- ) | |
| ) | |
| **GUS PALOIAN, as Chapter 7 Trustee,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 12 C 145** |
| ) | |
| **GENEVA SEAL, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| -------------------------------------------------------- ) | |
| ) | |
| **GUS PALOIAN, as Chapter 7 Trustee,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 12 C 147** |
| ) | |
| **LESTER LAMPERT, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Gus Paloian, as the Chapter 7 Trustee for Canopy Financial, Inc., sued Geneva

Seal, Inc., and Lester Lampert, Inc. in separate adversary proceedings in bankruptcy

court to recover fraudulent transfers received by the defendants from Canopy.  In

February 2012, the Court granted defendants' motions to withdraw the reference to the

bankruptcy court. Both Paloian and the defendants have moved for summary judgment on all of Paloian's claims. For the reasons stated below, the Court grants Paloian's motions and denies defendants' motions.

## Background

Canopy, a Delaware corporation headquartered in Chicago, developed software used by financial institutions and in the healthcare industry. Canopy developed software that allowed employers and employees to deposit money into health savings accounts and pay medical expenses out of them. Vikram Kashyap, Jeremy Blackburn, and Anthony Banas founded Canopy in 2004. Until 2009, Kashyap acted as CEO and chairman of the board of directors, Blackburn acted as chief operating officer and president, and Banas acted as chief technology officer. All three were also members of Canopy's board of directors, which also had two outside directors.

Beginning in 2007, Blackburn and Banas began taking money out of Canopy and purchasing personal items. Among other things, they bought more than thirty sports cars and luxury vehicles and leased two jets, four houses in Malibu, California, and five condominiums in Chicago. All of these purchases were concealed from Kashyap and the other members of the board and were not for business purposes. To finance these purchases, Blackburn and Banas took money not just from Canopy's accounts but also from custodial accounts that Canopy maintained on behalf of its clients who had established health savings accounts. In total, they took more than $18 million from the savings accounts.

Canopy was insolvent as early as July 31, 2007, but the actions of Blackburn and Banas made its financial condition worse. The two created false financial

statements and operating reports to conceal the purchases they were making and hide the fact that they were taking money from Canopy as well as the health savings accounts. They also hoped to attract additional investment. Through these misrepresentations, Blackburn and Banas were able to convince investors to give Canopy almost $75 million in 2009.

Two of the purchases made by Blackburn and Banas are the subject of these cases. In June 2009, Banas purchased an $80,000 engagement ring and a $20,000 watch from Lampert. The ring was for Banas's girlfriend, and it is unclear if the watch was for Banas's own use or a gift for someone else. The invoice for the purchases lists only Banas's name, and Lampert was to deliver the jewelry to an address in Los Vegas that Banas provided. The jewelry was paid for with two wire transfers, in the amounts of $55,000 and $45,000, from a Canopy account. The statement documenting the transfers noted that Canopy was the sender. Canopy never authorized or ratified the wire transfers. Individuals at Lampert knew that Banas worked at Canopy, but they did not inquire regarding why Canopy paid for the jewelry. In his deposition, however, David Lampert, a part-owner of Lampert, stated that in his experience people sometimes use expensive jewelry to create an successful image and help them in business. Pl. Lampert Reply at 78.

In August 2009, Blackburn purchased six watches, the most expensive of which was $52,000, and thirty-one watchbands, the most expensive of which was $20,000, from Geneva Seal. His total bill, as represented on two invoices, was $232,175. The invoices showed Blackburn as the only purchaser and requested that Geneva Seal ship the watches and bands to Blackburn's residence in Malibu. Blackburn did not

3

personally pay for his purchases; instead, he arranged a wire transfer from a Canopy account. Geneva Seal received the wire transfer, and the statement documenting the transfer stated that the sender was Canopy Financial, not Blackburn. Canopy had not authorized the transfer, nor did it subsequently ratify the transfer. When Alexander Kats, the vice president and half owner of Geneva Seal was asked if he had contacted Canopy to confirm that Blackburn had authority to make the wire transfer, he responded "I don't recall." Geneva Seal Ex. 1 at 87. Kats also testified that Blackburn said he was the founder of a shoe company, and he could not recall Blackburn ever mentioning Canopy to him. *Id.* at 40.

Canopy filed for bankruptcy under chapter 11 on November 25, 2009. The case was converted to a chapter 7 liquidation, and the bankruptcy court appointed Paloian as trustee. Paloian began adversary proceedings against Blackburn and Banas and obtained judgments against both for more than $93 million. Federal prosecutors charged Blackburn and Banas with wire fraud, and each pleaded guilty. Blackburn received a sentence of 180 months and was ordered to pay restitution of more than $93 million. He committed suicide before being incarcerated. Banas received a sentence of 160 months and was ordered to pay restitution of more than $19 million.

### Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

4

law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Paloian asserts three claims against each defendant, contending that the payments made by Canopy to Geneva Seal and Lampert are constructively fraudulent transfers under federal bankruptcy law and two sections of the Illinois Uniform Fraudulent Transfer Act (UFTA). *See* 11 U.S.C. § 548(a)(1)(B); 740 ILCS 160/5(a)(2) & 160/6(a). In all three claims, Paloian asserts that by action of Blackburn and Banas, Canopy transferred funds to defendants at a time when it was insolvent and did not receive reasonably equivalent value in return. Paloian also argues that Geneva Seal and Lampert are the initial transferees of the Canopy funds, so that the trustee may recover the funds from them. *See* 11 U.S.C. § 550(a)(1); 740 ILCS 160/9(b)(1).

Geneva Seal disputes whether it gave reasonably equivalent value in return for the funds it received from Canopy. It contends that Blackburn and Canopy were alter egos, and therefore it provided reasonably equivalent value to Canopy when it gave Blackburn the watches and watchbands in exchange for the funds from Canopy. Geneva Seal also claims that it is entitled to a defense provided by the bankruptcy code and the UFTA because it gave reasonably equivalent value and acted in good faith, although it fails to recognize that the good faith defense in the UFTA applies only to actually fraudulent transfers and not to constructively fraudulent transfers. *See* 11 U.S.C. § 548(c); 740 ILCS 160/9(a); *Helms v. Roti (In re Roti)*, 271 B.R. 281, 295 (Bankr. N.D. Ill. 2002) (§ 548(c) is an affirmative defense whose elements must be

5

proved by transferee).

Lampert contends that there is a genuine issue of fact on all of Paloian's claims because it gave reasonably equivalent value. Lampert also contends that it is entitled to summary judgment in its favor on Paloian's claim under the bankruptcy code because it gave reasonably equivalent value and acted in good faith. Lampert also argues that it is entitled to summary judgment on Paloian's claim under 740 ILCS 160/5(a)(2) because Canopy's transfer of the funds was not voluntary. Lampert finally contends that it is entitled to summary judgment on the claim under 740 ILCS 160/6(a) because Paloian has not demonstrated that there is a creditor who could bring a claim under that section. *See* 11 U.S.C. § 544(b)(1).

## A.    Reasonably equivalent value

Geneva Seal contends that Paloian's claims fail because it provided reasonably equivalent value in exchange for Canopy's funds. It also contends that it is entitled to the defenses provided in the bankruptcy code and the UFTA because it provided reasonably equivalent value and acted in good faith. Lampert contends that Paloian's motion for summary judgment must be denied because there is a genuine issue of fact regarding whether it provided reasonably equivalent value to Canopy. It also argues that it is entitled to summary judgment on Paloian's claims under the bankruptcy code because it satisfied the defense provided in the code by providing reasonably equivalent value and acting in good faith.

To support its contention that it provided reasonably equivalent value, Geneva Seal argues that Blackburn and Canopy were alter egos. Lampert contends that it provided reasonably equivalent value for three reasons:  (1) Banas and Canopy were

6

alter egos, (2) Banas had apparent authority to transfer Canopy's funds, and (3) Canopy derived business benefits from Banas's purchase of jewelry.

### 1.    Alter ego/piercing the corporate veil

As the Court has indicated, Geneva Seal contends that it provided value to Canopy because Canopy and Blackburn were effectively the same person, so that providing the watches to Blackburn gave value to Canopy for its funds.  Lampert makes the same argument with regard to Banas.  Both defendants seek to pierce the corporate veil of Canopy and associate it with the individual director who made the purchases at their stores.  They are attempting to reverse-pierce the corporate veil, namely, to attribute to Canopy dealings they had with individuals associated with Canopy.  *See Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995).

All parties assume that Illinois law governs any attempt to pierce the corporate veil of Canopy.  Because none of the parties raised a choice of law issue, the Court could appropriately apply Illinois law.  *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009) (applying law of the forum state when parties did not raise choice of law issue).  Canopy, however, is a Delaware corporation, and under Illinois choice of law rules, the law of the state of incorporation would govern an attempt to pierce the corporate veil.  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008).  It is unclear whether a district court should use state or federal choice of law rules when deciding bankruptcy claims, but even under federal choice of law rules, the law of the state of incorporation controls a corporate governance claim.  *See Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000) (assuming that

federal choice of law rules would follow internal affairs rule for derivative suit). Thus despite the parties' waiver of the issue, it appears that Delaware law should govern whether it is appropriate to pierce Canopy's corporate veil. The Court concludes, however, that the result is the same under either Illinois or Delaware law.

Under Illinois law, "a corporation's veil of limited liability will be pierced only when there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and when adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Judson Atkinson*, 529 F.3d at 379–80 (alterations and internal quotation marks omitted). Illinois law permits reverse-piercing the corporate veil, reaching through an individual to the corporation he controls. *See Sea-Land Servs., Inc. v. Pepper-Source*, 941 F.2d 519, 521–22 (7th Cir. 1991); *Barber v. Prod. Credit Servs. (In re KZK Livestock)*, 221 B.R. 471, 478 (Bankr. C.D. Ill. 1998). But "[p]iercing the corporate veil is a task which the courts should undertake reluctantly." *Tower Inv., LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1033, 864 N.E.2d 927, 941 (2007).

Under Delaware law, the party seeking to pierce the corporate veil must show that officers or shareholders of the corporation exercised "complete domination and control" over the corporation. *Wallace v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999). "The degree of control required to pierce the veil is exclusive domination and control to the point that [the corporation] no longer has legal or independent significance of its own." *Id.* at 1184 (ellipses, brackets in original, and internal quotation marks omitted). "Effectively, the corporation must be a sham and exist for no other purpose than as a

vehicle for fraud." *Id.*; *see also Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (veil piercing claim requires showing that corporation was created to defraud investors and creditors); *Winner Acceptance Corp. v. Return on Capital Corp.*, No. 3088-VCP, 2008 WL 5352063, at *6 (Del. Ch. Dec. 23, 2008) (calling fraud a "requisite element" of piercing the corporate veil).  Under Delaware law, however, it is not clear if a party can reverse-pierce the corporate veil.  *See MicroStrategy Inc. v. Acacia Research Corp.*, No. 5735-VCP, 2010 WL 5550455, at *12 n.90 (Del. Ch. Dec. 30, 2010) (declining to decide whether reverse-piercing is permissible under Delaware law).

Under either Illinois or Delaware law, piercing the corporate veil requires showing a unity of interest between Blackburn, Banas, and Canopy and that maintaining the separate existence of Canopy would sanction fraud or injustice.  Even if defendants could show that there was a unity of interest between the two directors and Canopy, they have not provided sufficient evidence from which a reasonable fact finder could find that Canopy's separate existence would sanction or create a fraud or injustice.

Both defendants argue that maintaining the corporate existence of Canopy would create an injustice because they would lose money.  Specifically, defendants argue that if they return the funds they received from Canopy, they will lose money because they are unable to recover from Blackburn and Banas, and the current location of the jewelry they purchased is unknown.  Each defendant also emphasizes that it is a small jewelry store that cannot readily absorb the losses it would suffer.

As an initial matter, neither defendant has provided any evidence to suggest that the location of the jewelry is unknown and that it is therefore unrecoverable.  Rather, they merely assert it.  Given the dearth of evidence in the record, no reasonable fact

9

finder could determine that defendants have no prospects for recovery should they be required to repay Canopy.

More importantly, the mere fact that defendants stand to lose money is insufficient to constitute a fraud or injustice requiring the Court to pierce the corporate veil.  In every case where a party seek to pierce a corporation's veil, that party is concerned that it will not be paid on a claim.  Otherwise there would be no reason to seek to pierce the corporate veil at all.  *See Sea-Land Servs.*, 941 F.2d 522–23; *see Midland Interiors, Inc. v. Burleigh*, No. 18544, 2006 WL 4782237, at *4 (Del. Ch. Dec. 19, 2006) (insolvency and inability to pay creditors cannot alone justify piercing the corporate veil).  Therefore, "the courts that properly have pierced corporate veils to avoid promoting injustice have found that, unless it did so, some wrong beyond a creditor's inability to collect would result."  *Sea-Land Servs.*, 941 F.2d 519, 524 (internal quotation marks omitted); *cf. Winner Acceptance Corp.*, 2008 WL 5352063, at *6 (fraud element of piercing the corporate veil established when defendants allegedly made promises to plaintiff that they did not intend to keep and planned to abscond with corporate assets).

Furthermore, the circumstances of this case ensure that someone will lose money due to the wrongs of Blackburn and Banas.  Defendants focus on the potential loss to them.  They disregard the fact that if they are permitted to retain Canopy's funds, they will in effect impose a loss on all of the entity's other creditors, such as the people who placed their money in health savings accounts controlled by Canopy from which Blackburn and Banas took more than $18 million or the people whom Blackburn and Banas fraudulently persuaded to invest nearly $75 million.  The Seventh Circuit has

10

stated that "[r]everse piercing is ordinarily possible only in one-man corporations, since if there is more than one shareholder the seizing of the corporation's assets to a shareholder's debts would be a wrong to the other shareholders." *Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995). In this case, there are not only shareholders other than Blackburn and Banas, but also numerous creditors. The Court finds persuasive the reasoning of the bankruptcy court in *KZK Livestock*, which found veil piercing inappropriate because it would lead to greater injustice. The court noted that in bankruptcy the interests of other creditors must be considered and that "[t]o permit a single creditor . . . to keep a substantial payment while other creditors have to share in the remaining assets would lead to an unfair result." *In re KZK Livestock*, 221 B.R. at 479.

Defendants cite *Dzikowski v. Friedlander (In re Friedlander Capital Mgmt. Corp.*), 411 B.R. 434 (Bankr. S.D. Fla. 2009), as a case that disagreed with the court's conclusion in *KZK Livestock*. In *Friedlander*, Friedlander loaned money from his corporation, which was later the debtor in the bankruptcy case, to his ex-wife. *Id.* at 439. The ex-wife repaid the money by wiring funds to an account of Friedlander's. *Id.* Friedlander gave some of the money back to the debtor but used most of it to pay personal expenses. *Id.* The bankruptcy trustee later tried to recover the money from the ex-wife as a fraudulent transfer, arguing that she had not provided value for the loan because the loan repayment never made it to the debtor itself. *Id.* at 440. The court, applying Connecticut corporate law, concluded that it was appropriate to pierce the corporate veil because failing to do so would be inequitable to the ex-wife. *Id.* at

11

445–46.

*Friedlander* is distinguishable from the current case.  There, the court concluded that equity favored piercing the corporate veil for two reasons.  First, the majority of creditors of the debtor had received full compensation, and of the remaining three creditors, one had submitted no documentation to prove the validity of the claim, and the trustee had objected to the other two.  *Id.* at 445.  Here, by contrast, there are no facts to indicate that the creditors of Canopy have largely been repaid.  Second, it was undisputed that Friedlander's ex-wife believed that she had received the loan from Friedlander himself, not the debtor corporation, and so she repaid Friedlander directly. *Id.* at 445–46.  In this case, the wire transfers that defendants received stated that Canopy was making payment, not Blackburn or Banas.

Geneva Seal also appears to contend that injustice will result unless the corporate veil of Canopy is pierced because Blackburn will be unjustly enriched.  *See Sea-Land Servs.*, 941 F.2d at 524 (listing unjust enrichment as one factor that could justify piercing the corporate veil).  Geneva Seal asserts that Blackburn would be able to benefit from the jewelry he purchased from Geneva Seal without paying if Geneva Seal is required to repay Canopy's funds.  If Geneva Seal retains the funds, however, Blackburn will still be unjustly enriched, but that will come at the expense of the other creditors of Canopy instead.  As discussed above, veil piercing doctrine does not hold that a single creditor's desire to be paid is sufficient to pierce the corporate veil.

In sum, the Court concludes that no reasonable fact finder could find the elements of an Illinois or Delaware law veil piercing claim satisfied in this case. Accordingly, Geneva Seal's argument that it provided reasonably equivalent value to

12

Canopy fails, as does its argument that it is entitled to the good faith defenses under the bankruptcy code and the UFTA. The Court therefore grants summary judgment in favor of Paloian on his claims against Geneva Seal.

### 2. Apparent authority

Lampert contends that it gave reasonably equivalent value to Canopy because Banas had apparent authority to make the jewelry purchases on Canopy's behalf.

> Apparent authority arises when a principal creates a reasonable impression to a third party that the agent has the authority to perform a given act. To prove apparent authority, the proponent must show that (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority, (2) based on the actions of the principal and agent, the third party reasonably concluded that the agent had authority to act on the principal['s] behalf, and (3) the third party justifiably relied on the agent's apparent authority to his detriment. In establishing apparent authority, it is critical to find some words or conduct by the principal that could reasonably indicate consent.

*Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 895–96, 940 N.E.2d 229, 235–36 (2010) (citations omitted). Lampert contends that five facts support the existence of apparent authority: (1) Banas appeared successful in business, (2) Banas had a history of buying from Lampert, (3) Banas sometimes communicated with Lampert from a Canopy e-mail address, (4) Banas was able to make a wire transfer in Canopy's name, and (5) Banas was a member of Canopy's board.

The first two of Lampert's facts represent actions by Banas, not Canopy, and thus they cannot help establish apparent authority. Canopy did act in providing Banas with an e-mail address, but no reasonable fact finder could conclude that the fact that Banas had a Canopy e-mail address indicated that he had apparent authority to buy $100,000 in jewelry. Among other things, there are no facts in the record to indicate

13

that only high-level employees with substantial authority at Canopy had company e-mail addresses. The fact that Canopy apparently allowed Banas to arrange for Canopy to wire transfer funds indicates that he had some amount of authority at Canopy. But the mere fact that Banas could arrange a wire transfer would not allow a reasonable third party to conclude that he had authority and approval to make any wire transfer, especially when it is undisputed that Canopy did not consent to the wire transfer and that it was not involved in any business involving jewelry.

Finally, Lampert cites that fact that Banas was a director of Canopy as a reason that a reasonable third party could conclude that he had authority to purchase jewelry. There is no evidence in the record, however, from which a reasonable jury could conclude that Lampert knew Banas was a director. David Lampert stated that he learned that Banas worked at Canopy from conversation and by receiving e-mails from Banas's work e-mail address. Pl. Lampert Ex. 1 at 24, 73–74. David Lampert also testified that Banas told Lampert that he wrote software used by banks. Pl. Lampert Reply, Ex. A at 23. A reasonable fact finder could not infer from these statements that Lampert knew that Banas was a director of Canopy, and Lampert has not indicated that it had any other basis to know that he was. Furthermore, even if Lampert knew that Banas was a director, that would not give Banas apparent authority to make any and all purchases on Canopy's behalf, particularly purchases that had nothing to do with Canopy's business. *See Crawford Sav. & Loan Ass'n v. Dvorak*, 40 Ill. App. 3d 288, 293, 352 N.E.2d 261, 265 (1976) (person answering phone at a business has apparent authority to conduct usual and ordinary business, but not unusual transactions like mortgaging a building); *see also Rouse Woodstock, Inc. v. Surety Fed. Sav. & Loan*

14

*Ass'n*, 640 F. Supp. 1004, 1010 (N.D. Ill. 1986) (bank could not assume that vice president had broad inherent authority to make decisions absent indications that board or by-laws have given him authority).

In sum, no reasonable fact finder could conclude from the evidence offered by Lampert that Banas had apparent authority to purchase the jewelry.

### 3. Use of jewelry for business purposes

Finally, Lampert contends that it gave reasonably equivalent value to Canopy for its funds, because jewelry like that purchased by Banas is often used by business people to convey an image of success. Therefore, Lampert argues, Canopy received value from Banas's use of the jewelry.

At the outset, the Court notes that it doubts that any *reasonable* fact finder could conclude that Banas's purchase of an $80,000 engagement ring for his girlfriend could provide any business benefit for Canopy. Regardless, Banas has expressly stated that he did not purchase any of the jewelry for any business purpose, Pl. Lampert Ex. 2 ¶ 23, and it is undisputed that Banas did not in fact do anything with the jewelry which could have benefitted Canopy. Lampert argues that David Lampert testified that in his "personal business experience, that's what people use jewelry for is to create impressions to help them in business. It's very common." Pl. Lampert Reply, Ex. A at 78. David Lampert could not, however, provide any reason beyond his general experience to think that in this case Banas was using the jewelry for Canopy's purposes. *Id.* David Lampert's general statement that sometimes business people use jewelry to look successful does not counter Banas's specific statement that he had no

15

business purpose in buying the jewelry. Lampert's statement does not create a genuine issue of fact.

The Court concludes that no reasonable fact finder could find that Banas's purchase of the jewelry conveyed any benefit to Canopy. Accordingly, all of Lampert's contentions that it provided Canopy with reasonably equivalent value fail, as does its contention that it is entitled to a good-faith defense on Canopy's bankruptcy law claim. The Court therefore grants summary judgment in favor of Paloian on his section 548(a)(1)(B) claim against Lampert.

## B.  Necessity of voluntary transfer

Lampert contends that Paloian's claim under 740 ILCS 160/5(a)(2) fails because Canopy's transfer of the funds was not voluntary. That section of the UFTA does not mention voluntariness. It states only that "[a] transfer . . . is fraudulent . . . if the debtor made the transfer . . . (2) without receiving a reasonably equivalent value in exchange for the transfer" and the debtor had unreasonably few assets or was insolvent. *Id.* Further, the UFTA's definition section defines transfer to mean "every mode, direct or indirect, absolute or conditional, *voluntary or involuntary*, of disposing of or parting with an asset or an interest in an asset." *Id.* § 160/2(*l*) (emphasis added). Based upon the clear language of the UFTA, the statute covers involuntary as well as voluntary transfers.

Lampert cites a statement by the Seventh Circuit that a claim under section 160/5(a)(2) requires proof that "the debtor made a voluntary transfer." *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997). This statement, which

16

the court made while listing all of the elements of a claim under section 160/5(a)(2), is dicta. There was no issue in *GE Capital* regarding whether the challenged transfer was voluntary. The transfer in question had occurred as part of the settlement of a class action lawsuit. Thus there was no issue of whether the transferor had voluntarily made the transfer, unlike in the current case, where Banas effectively stole money from Canopy. *Id.* at 1077.

In addition, the Illinois Supreme Court case cited by the Seventh Circuit as authority for its list of the elements of a section 160/5(a)(2) claim does not require the transfer to be voluntary. *Gendron v. Chicago & N.W. Transp. Co.*, 139 Ill. 2d 422, 438, 564 N.E.2d 1207, 1215 (1990). The other three cases cited by the Seventh Circuit are, like *Gendron*, decisions under an older version of the Illinois fraudulent transfer statute that was replaced by the current statute in 1990. *Id.* at 437, 564 N.E.2d at 1214; *see Bay State Milling Co. v. Martin (In re Martin)*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992); *Aluminum Mills Corp. V. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 888 (Bankr. N.D. Ill. 1991); *Anderson v. Ferris*, 128 Ill. App. 3d 149, 153, 470 N.E.2d 518, 521 (1984).

These cases also appear to be using the term voluntary in an unusual way. *Anderson*, for example, states that constructive fraud requires "a voluntary gift" and then says that because a party received no consideration for a conveyance, "the transfer is deemed voluntary." *Anderson*, 128 Ill. App. 3d at 153, 470 N.E.2d at 521. *Anderson* seems to use the term voluntary to mean something like "not for equivalent value." *Gendron* cites to *Anderson*, but instead of saying that a voluntary gift is

17

required, the court required "a transfer made for no or inadequate consideration." *Gendron*, 139 Ill. 2d at 438, 564 N.E.2d at 1215.

In light of the clear language of the UFTA and the Illinois Supreme Court's determination that under the older Illinois statute no voluntary transfer was required, the Court determines that the Illinois Supreme Court would not interpret the UFTA to require a voluntary transfer. *See BMD Contractors, Inc. v. Fid. & Deposit Co. of Md.*, 679 F.3d 643, 648 (7th Cir. 2012) (when applying state law, court must determine how state supreme court would decide the issue).

Lampert cites several other cases in which a court has stated that a voluntary transfer is required. *KHI Liquidation Tr. v. Wisenbaker Builder Servs. (In re Kimball Hill Inc.)*, 449 B.R. 767, 782 (Bankr. N.D. Ill. 2011); *Grochocinski v. Schlossberg (In re Eckert)*, 388 B.R. 813, 841 (Bankr. N.D. Ill. 2008); *Apollo Real Estate Inv. Fund IV, LP v. Gelber*, 403 Ill. App. 3d 179, 194, 935 N.E.2d 963, 976 (2010). In none of these cases was the voluntariness of the transfer a contested issue. None of the courts discussed the meaning of or rationale for a purported voluntariness requirement. In light of the clear language of the UFTA, the Court respectfully disagrees with the conclusions of the bankruptcy judges and concludes that the Illinois Supreme Court would decide the issue differently than did the Illinois Appellate Court. *See BMD Contractors*, 679 F.3d at 648 ("If the state supreme court has not spoken on a particular issue, then decisions of the intermediate appellate court will control unless there are persuasive indications that the state supreme court would decide the issue differently.")

In sum, under section 160/5(a)(2) of the Illinois UFTA, there is no requirement for

18

the transfer to be voluntary.  Accordingly, the Court grants summary judgment in favor of Paloian on his claim against Lampert under that section.

## C.    Existence of creditors

In its initial brief, Lampert argued that it was entitled to summary judgment on Paloian's claim under 740 ILCS 160/6(a) because a claim under that section requires "a creditor whose claim arose before the transfer was made."  *Id.*  Lampert assumed in its opening brief that it was the creditor to which the statute referred and contended that Paloian's claim fails because it had no claim before Banas transferred Canopy's funds. As Paloian argued in his response, however, the trustee is the creditor referred to by that section of the UFTA.  *See In re Roti*, 271 B.R. 281, 304–05 (creditor is the person asserting fraudulent transfer claim).  Consequently, in Lampert's reply it changed its argument and asserted that Paloian's claim failed because there was no specific creditor who had a claim before the time of the transfer.  *See* 11 U.S.C. § 544(a) (trustee can avoid any transfer that an existant creditor with an unsecured claim may avoid under state law).

Lampert has forfeited this argument by failing to present it until its reply brief. *See Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004); *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320, 329 (N.D. Ill. 2005).  The Court notes that  Lampert's initial argument was poles apart from its current contention.  Lampert initially asserted that it was the creditor referred to by section 160/6(a), but now it asserts that there is no identified creditor under that section.

Even if not forfeited, Lampert's contention fails on the merits.  Because the

trustee can avoid any transfer that a creditor with an allowable unsecured claim can avoid, Paloian need only show that there is some unsecured creditor whose claim arose before the transfer was made. Under the UFTA, a claim is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 ILCS 160/2(c). It is undisputed that Canopy was insolvent as early as July 31, 2007. Therefore, at that time there must have been a larger amount in claims against the corporation than it had in assets. Because "creditor means a person who has a claim," *id.* § 160/2(d), by definition, there must have been creditors who had claims at that time.

Paloian has also presented an unrebutted expert report stating that Canopy was insolvent on June 30, July 22, and October 9, 2008. Pl. Lampert Ex. 5 at 22–23. Further, on July 15, 2009, just over a month after Banas wired funds to Lampert, Paloian's expert reported that Canopy had $67 million more in liabilities than in assets, making it very unlikely that no unsecured creditor had a claim against Canopy at the time of the transfer. *Id.* at 22. It is also undisputed that between 2008 and 2009, Banas and Blackburn took $18 million from the health savings accounts of Canopy's clients. All of those clients would also have claims against Canopy, some portion of which must have arisen in 2008, before the transfer to Lampert. Based on this evidence, no reasonable fact finder could conclude that there were no unsecured creditors at the time of Banas's transfer to Lampert.

Lampert contends that at least some of the claims have not been allowed by the bankruptcy court. 11 U.S.C. § 502. To give the trustee a right to recovery under the

20

UFTA, however, claims need not be allowed, but only allowable. *Id.* § 544(b)(1). In bankruptcy, all claims are "deemed allowed, unless a party in interest . . . objects." *Id.* § 502(a). Lampert does not contend that any and all of the claims that existed against Canopy on the day Lampert received the wire transfer will be objected to by a party in interest.

In sum, the Court grants summary judgment in favor of Paloian on his claim against Lampert under section 160/6(a) of the UFTA.

### Conclusion

For the reasons stated above, the Court grants Paloian's motions for summary judgment [Bankruptcy Adv. No. 11-2072, docket no. 18; Bankruptcy Adv. No. 11-2073, docket no. 22] and denies Geneva Seal's and Lampert's motions for summary judgment [Case no. 12 C 145, docket no. 35; case no. 12 C 147, docket no. 33]. The Court directs Paloian to submit a draft form of judgment in both cases by no later than the close of business on September 4, 2012 and sets both cases for a status hearing on September 5, 2012 at 9:30 a.m.


                                                                         s/ Matthew F. Kennelly
                                                       MATTHEW F. KENNELLY
                                                   United States District Judge

Date: August 28, 2012